UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA,

    v.

ISIAH PIERCE a/k/a Isiah Johnson and
LARRY WILLIS,

    Defendants.

17-CR-32
DECISION AND ORDER

---

On November 22, 2017, after hearing evidence over three days and deliberating for a day and a half, the jury returned a verdict on the 12-count superseding indictment in this matter. The charges were based on narcotics and weapons recovered from both the upper and lower apartments at 70 Henrietta Avenue in Buffalo, New York, as well as narcotics found in police interview rooms at 45 Elm Street in Buffalo. Docket Item 32. Defendant Isiah Pierce was acquitted of conspiring to sell narcotics and possessing narcotics found in the interview room where he was placed after his arrest; he was convicted on seven counts of possessing narcotics and weapons consistent with what was found in the upper apartment at 70 Henrietta. Defendant Larry Willis was acquitted of conspiring to sell narcotics, of possessing those narcotics found only in the upper apartment, and of possessing the narcotics found in the interview room where he was placed after his arrest; he was convicted on five counts of possessing narcotics and weapons consistent with what was found in the lower apartment.

At the conclusion of the government's proof at trial, both defendants moved for judgments of acquittal under Federal Rule of Criminal Procedure 29. After trial, both

defendants renewed those motions as to the counts of conviction. For the following reasons, those motions are denied.

## FACTS

On December 1, 2016, as part of a narcotics investigation, police officers obtained and executed two search warrants for the duplex at 70 Henrietta Avenue, Buffalo, New York—first for the lower apartment and then for the upper apartment. On the same day, but before the warrants were obtained and executed, police arrested both Pierce and Willis, who had been seen exiting the house separately.

The officers who executed the search found narcotics and weapons in both the upper and lower apartments. In addition, the officers who processed both defendants at the police station found narcotics on the floor of the separate rooms in which each defendant was held. More specifically, in the room where Willis was held, the officers found a quantity of heroin and a quantity of cocaine base; in the room where Pierce was held, the officers found a quantity of cocaine base.

Both defendants were charged with conspiring to possess and distribute narcotics; possessing narcotics with intent to distribute them; possessing firearms in furtherance of drug trafficking crimes; possessing firearms when they were precluded from doing so by prior felony convictions; and maintaining a drug-involved premises. More specifically, the most recent charges—filed on May 19, 2017—included the following:

- Count 1 – conspiring to possess with intent to distribute and to distribute heroin and butyryl fentanyl, cocaine base, cocaine, and fentanyl; and conspiring to use and maintain 70 Henrietta Avenue for the purpose of manufacturing, distributing, and using those substances (both defendants);

2

- Count 2 – possessing cocaine base with intent to distribute (both defendants);

- Count 3 – possessing heroin and butyryl fentanyl with intent to distribute (both defendants);

- Count 4 – possessing fentanyl with intent to distribute (both defendants);

- Count 5 – possessing cocaine with intent to distribute (both defendants);

- Count 6 – maintaining a drug-involved premises (both defendants);

- Count 7 – possessing firearms in furtherance of drug trafficking (both defendants);

- Count 8 – possessing firearms and ammunition by a felon (defendant Pierce);

- Count 9 – possessing firearms and ammunition by a felon (defendant Willis);

- Count 10 – possessing heroin with intent to distribute post arrest at the police station (defendant Willis);

- Count 11 – possessing cocaine base with intent to distribute post arrest at the police station (defendant Willis); and

- Count 12 – possessing cocaine base with intent to distribute post arrest at the police station (defendant Pierce).

Counts 2 through 9 involved the possession of narcotics and weapons at 70 Henrietta Avenue. Counts 10 through 12 involved the possession of narcotics found in the interview rooms where each defendant was placed after his arrest. Docket Item 32.

The prosecution's theory of the case was that both defendants conspired to sell narcotics from 70 Henrietta. In support of that theory, the government presented evidence that both defendants were at 70 Henrietta while that property was under surveillance on December 1, 2016. The government showed the jury clothing purportedly belonging to both defendants, as well as photos of both defendants, that were found in the upper and lower apartments. And the government provided the key

3

ring that Willis was found with when he was arrested, which included keys that opened both the main door of the duplex and the door to the lower apartment; and the key ring that Pierce was found with when he was arrested, which included keys that opened both the main door and the door to the upper apartment.

The verdict makes clear that the jury rejected the government's theory that the two defendants were involved in a narcotics conspiracy. Not only did the jury acquit both defendants of the conspiracy count, but the jury found defendant Pierce guilty only of those counts that were consistent with the amounts and types of narcotics found in the upper apartment and defendant Willis guilty only of those counts consistent with the amounts and types of narcotics found in the lower apartment.

## **DISCUSSION**

In their post-trial motions, both defendants claim that the evidence was insufficient for the jury have convicted them of anything. The defendants propose alternative views of the facts that they say should have led to each defendant's acquittal and that they claim "are just as reasonable" as the jury's conclusion of guilt. *See, e.g.*, Docket Item 84 at 3 ("at best, the evidence presented lends to an inference of innocence just as reasonable as one of guilt"); Docket Item 81 at 4 ("the evidence is equally, if not more consistent, with an inference that the defendant was at 70 Henrietta" for an innocent purpose).

On a Rule 29 motion for acquittal, however, the defendant bears a heavy burden. The defendant's conviction "must be affirmed if any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Cote*, 544 F.3d 88, 98 (2d Cir. 2008) (quotations and alterations omitted). All inferences

must be drawn in favor of the government, and the court must view the evidence in the light most favorable to the government.  *See id.* at 93; *United States v. Puzzo*, 928 F.2d 1356, 1361 (2d Cir. 1991).  The court may not substitute its own view of the evidence for that of the jury, and if both a reasonable doubt and no reasonable doubt are "fairly possible, the court must let the jury decide the matter." *United States v. Autuori*, 212 F.3d 105, 114 (2d Cir. 2000) (quotations and alterations omitted).

Here, the jury's verdict was not only reasonable but was careful, thoughtful, and logically consistent.  The jury found the evidence that the defendants conspired together insufficient to convict either defendant of conspiracy.  It convicted each defendant of possessing only those narcotics, and therefore presumably those weapons, located in the apartment over which that defendant clearly had dominion and control.  The jury also found the proof about narcotics found on the floor of the interview rooms insufficient to link those narcotics beyond a reasonable doubt to the defendants.  And that careful, mixed verdict ought not to be disturbed, especially in light of the strong evidence connecting defendant Willis to the lower apartment and defendant Pierce to the upper.  Docket Item 89 at 7-8; Gov't Exs. 29A, 29B, 29D, 30B, 30C, 30D, 30E, 30K, 30N, 50, 56, 57; 3506-E; 3506-F.

**<u>PIERCE</u>**

Pierce was seen leaving the duplex at 70 Henrietta and was arrested with keys that opened both the main door and the door to the upper apartment.  The key ring Pierce possessed also had a key for the padlock that secured the bedroom door in the upper apartment, as well as a Tops Market bonus card that belonged to Courtney Brouse, the mother of Pierce's child.  Locked in that second floor closet were narcotics

5

and weapons, one of which had DNA matching Pierce's profile.  Gov't Exs. 3506-E, 3506-F.

Pierce claims that the evidence at trial was insufficient for the jury to conclude that the keys were his.  Docket Item 81.  He proposes two theories that he claims are equally as plausible as the government's theory: 1) that the keys belonged to Tanzie Fuller, the passenger in the vehicle Pierce was driving when he was stopped and arrested; and 2) that Pierce was test driving the car for possible purchase, noting that the car was registered to defendant Willis.  And because the keys did not necessarily belong to him, Pierce argues, the link between him and the upper apartment was tenuous at best.

There are several problems with Pierce's arguments.  First, other than the fact that Fuller was once in Brouse's home, no evidence connected Fuller to Brouse in a way that would explain why Brouse's Tops Market card might be on Fuller's key ring.  In contrast, there was a great deal of evidence connecting Brouse with Pierce.  As noted above, Brouse was Pierce's girlfriend and is the mother of his child.  Moreover, shortly after Pierce was arrested, he called Brouse and discussed bail money that was located at her residence.  In fact, police officers later obtained a search warrant for Brouse's residence and recovered a safe containing $20,000 and a shoebox containing over $5,500.  Even though, as Pierce notes, the government did not present evidence that Pierce still lived with Brouse or was still in a relationship with her, there clearly was enough of a connection between Pierce and Brouse for the jury to find beyond a reasonable doubt that the key ring with Brouse's Tops Market card recovered from Pierce indeed belonged to him.

6

The connection between Pierce and Brouse also supports the jury's rejection of Pierce's second theory: that he was test driving Willis's car when he was arrested and that the keys therefore were not his. The car may have been registered to Willis, but the evidence did not offer any reason why Brouse's Tops card would be on Willis's key ring; in fact, there was no apparent connection between Brouse and Willis, in marked contrast to Brouse and Pierce. So regardless of the name on the car's registration, the jury's rejection of Pierce's second theory at trial was neither unreasonable nor unwarranted.

### **WILLIS**

The evidence connecting Willis to the lower apartment was even stronger. When Willis was arrested, he was alone and in possession of keys that opened the main entrance and the lower apartment at 70 Henrietta. A photograph found in that apartment showed Willis with that same key ring on his belt. So the jury certainly could have concluded that those keys belonged to Willis and gave him dominion and control over the lower apartment.

In addition, there were numerous photos of Willis in the lower apartment. One of those photos showed Willis in distinctive clothing—clothing that the police recovered when they searched the lower apartment. The fact that Willis's clothes—as proven by the photos—were found in the apartment further supports the conclusion that he had dominion and control over it.

What is more, the lower apartment was littered with several documents, including motor vehicle records and insurance records, bearing Willis's name. One of those documents was a Buffalo Police Department incident card that had been given to Willis

7

at the scene of a motor vehicle accident about a month before the search of the apartment. Those documents likewise linked Willis to the lower apartment.

All that evidence, combined with the testimony that Willis was at 70 Henrietta for several hours while that duplex was under surveillance by law enforcement, amply supports the jury's verdict.

## **DOMINION**

Both defendants argue that because the narcotics and weapons were hidden rather than exposed in the upper and lower apartments, the jury had no basis for concluding that the defendants knew that the narcotics and weapons were in the apartments. Willis cites *United States v. Navedo*, 443 F. Supp. 2d 431, 436 (W.D.N.Y. 2006) in support of the proposition that narcotics hidden in a house may not be constructively possessed by someone found in the house. But the facts of *Navedo* were markedly different from the facts here. Navedo was at the house only to purchase narcotics; other than that, he had no connection to it. *Id.* at 434-35. Here, in marked contrast, the defendants had keys giving them access to—and control over—the respective apartments. Pierce also had a key to the locked closet where the narcotics and weapons were found in the upper apartment. And other evidence—photos, clothing, and documents, for example—connected each defendant to his respective apartment.

Given the strong evidence connecting each defendant to one of the apartments, the jury inferred that each defendant exercised dominion and control over, and knew about, the narcotics and weapons hidden in his respective apartment. That inference was no stretch. Especially, because this Court must draw all reasonable inferences in

8

favor of the government on a Rule 29 motion, the defendants' argument offers no reason to disturb the jury verdict.

The verdict makes clear that the jury linked Willis with the lower apartment and Pierce with the upper apartment. The jury's acquittal of both defendants on the conspiracy charge, its acquittal of both defendants on the charge of possessing narcotics at the police station, and its acquittal of Willis on the charges of possessing narcotics found only in the upper apartment evidences a careful and logical review of the proof; it also demonstrates a good understanding of the jury's responsibility to convict a defendant only if it were convinced of that defendant's guilt beyond a reasonable doubt. There is no reason to revisit that thoughtful verdict, and the defendants' Rule 29 motions therefore are DENIED.

SO ORDERED.

Dated:   February 21, 2018
         Buffalo, New York

                                           *s/Lawrence J. Vilardo*
                                           LAWRENCE J. VILARDO
                                           UNITED STATES DISTRICT JUDGE